## BLESSETT et al. v. TURCOTTE et al.

(136 N. W. 945.)

**Mortgages — rights of parties — mortgagee takes possession before foreclosure.**

1. A mortgagee who, after condition broken, but before foreclosure, enters upon the mortgaged premises and takes possession thereof, will be presumed to do so for the purpose of collecting the rents and profits, and of applying them upon the mortgage debt.

**Mortgages — statute of limitations — redemption.**

2. Such mortgagee does not hold adversely to his mortgagor under § 6793, Revised Codes of 1905. The ten-year statute of limitations will not, therefore, begin to run against an action for redemption, until he asserts a claim as a purchaser under a foreclosure sale, or some other claim inconsistent with that

---

Note.—On the question whether possession of party to mortgage is adverse within rule against conveyance of land held adversely, see note in 35 L.R.A.(N.S.) 751. And as to whether limitation runs against mortgagee in possession, see note in 34 L.R.A.(N.S.) 356.

For accounting by mortgagee in possession for rents and profits, see note in 4 Am. St. Rep. 70.

23 N. D.—27.

of a mere lien holder, or until a tender of the mortgage debt has been made, and he has refused to surrender the possession of the land.

**Mortgages — redemption — accounting from mortgagee for rents and profits.**

3. In an action to redeem from a mortgagee in possession, plaintiff is entitled to an accounting from such mortgagee of the rents and profits during the latter's occupancy of the premises, and where, for any reason, such accounting is not or cannot be made, plaintiff will be permitted, in lieu thereof, to recover from such mortgagee in possession the reasonable rental value of such premises.

Opinion filed May 23, 1912.   Rehearing denied June 18, 1912.

Appeal by plaintiffs from a judgment of the District Court for Towner County, *Buttz,* Special Judge, in defendants' favor in an action brought to quiet title to certain land.

Reversed.

*Robinson & Lemke* and *J. E. Robinson,* for appellants.

Possession of real property under any lien, without the consent of the owner, is piratical, and the owner may recover his property, regardless of the lien.   McClory v. Ricks, 11 N. D. 38, 88 N. W. 1042; Finlayson v. Peterson, 11 N. D. 45, 89 N. W. 855; Newton v. McKay, 30 Mich. 380; Bowen v. Brogan, 119 Mich. 218, 75 Am. St. Rep. 387, 77 N. W. 942; Lewis v. Hamilton, 26 Colo. 263, 58 Pac. 196; Galloway v. Kerr, — Tex. Civ. App. —, 63 S. W. 180.

A party may not occupy inconsistent positions.   He may not claim the benefit of a consent to his possession, and at the same time repudiate the consent by claiming an adverse possession.   1 Enc. Law, 251; Backus v. Burke, 63 Minn. 272, 65 N. W. 461.

Where the entry is permissive, the statute will not begin to run until an adverse holding is declared and notice of such change is brought to the knowledge of the holder of the legal title.   St. Joseph v. Seel, 122 Mich. 70, 80 N. W. 987; Cameron v. Chicago, M. & St. P. R. Co. 60 Minn. 100, 161 N. W. 814; Bartlett v. Secor, 56 Wis. 520, 14 N. W. 714; Smith v. Hitchcock, 38 Neb. 104, 56 N. W. 793; Doris v. Story, 122 Ga. 611, 50 S. E. 348; Stafford v. Stafford, 96 Tex. 106, 70 S. E. 75.

Any acknowledgment of the mortgage as a lien, or any acknowledgment that the mortgage debt is still due and owing, cuts off and bars any prior operation of the statute.   2 Bl. Com. 157; 15 Enc. Law 830;

Buswell, Limitations, 318; 27 Cyc. 1071; Jones v. Foster, 175 Ill. 459, 57 N. E. 862; Rockwell v. Servant, 63 Ill. 424; Waldo v. Rice, 14 Wis. 286; Robinson v. Fife, 3 Ohio St. 551; Marks v. Pell, 1 Johns. Ch. 594; Morgan v. Morgan, 10 Ga. 297; Borst v. Boyd, 3 Sanf. Ch. 501; Proctor v. Cowper, 2 Vern. 277, Perc. in Ch. 116; Edsell v. Buchanan, 2 Ves. Jr. 83; Cutts v. York Mfg. Co. 18 Me. 190.

*Fred E. Harris* and *Engerud, Holt, & Frame,* for respondents.

A mortgagee who takes possession of the land covered by his mortgage, and occupies it for a period of ten years, asserting a right to it hostile to that of the mortgagor, acquires an absolute title to the land. Nash v. Northwest Land Co. 15 N. D. 566, 108 N. W. 792; Mears v. Somers Land Co. 18 N. D. 384, 121 N. W. 916; Rogers v. Benton, 39 Minn. 39, 12 Am. St. Rep. 613, 38 N. W. 765; Russell v. H. C. Akeley Lumber Co. 45 Minn. 376, 48 N. W. 3; Kelso v. Norton, 65 Kan. 778, 93 Am. St. Rep. 308, 70 Pac. 898.

The right of a mortgagee to acquire a title by adverse occupation is not confined to cases of void foreclosure. Nash v. Northwest Land Co. 15 N. D. 566, 108 N. W. 792; Spect v. Spect, 88 Cal. 437, 13 L.R.A. 137, 22 Am. St. Rep. 314, 26 Pac. 203.

Notice to the mortgagor of the hostile possession, while necessary, need not be express. Mears v. Somers Land Co. 18 N. D. 384, 121 N. W. 915; Nash v. Northwest Land Co. 15 N. D. 574, 108 N. W. 792.

Pledgee, having acquired possession of the thing pledged, may keep it till the debt for which it was pledged is paid. Spect v. Spect, 88 Cal. 437, 13 L.R.A. 137, 22 Am. St. Rep. 314, 26 Pac. 203; Brinkman v. Jones, 44 Wis. 512; Trimm v. Marsh, 54 N. Y. 606, 13 Am. Rep. 623; Kortwright v. Cady, 21 N. Y. 364, 78 Am. Dec. 145; Henry v. Confidence Gold & S. Min. Co. 1 Nev. 622; Packer v. Rochester & S. R. Co. 17 N. Y. 295.

The fact that the pledgee may retain possession of the thing pledged until his debt is paid does not prevent him from setting up a right to the pledge hostile to that of the mortgagor or pledgeor. Spect v. Spect, 88 Cal. 437, 13 L.R.A. 137, 22 Am. St. Rep. 314, 26 Pac. 203; Nash v. Northwest Land Co. 15 N. D. 566, 108 N. W. 792; Backus v. Burke, 63 Minn. 272, 65 N. W. 459.

Because the mortgagee asserted a hostile right to the land in controversy, and the mortgagor was bound to pay the debt before he could re-

cover this property, his only remedy was an action to redeem. Nash v. Northwest Land Co. 15 N. D. 575, 108 N. W. 792; Hubbell v. Sibley, 50 N. Y. 468; Houts v. Hoyne, 14 S. D. 176, 84 N. W. 773.

BRUCE, J. The questions presented in this controversy do not come before us as matters of first impression, but the law of the case has been largely determined upon a former appeal. Blessett v. Turcotte, 20 N. D. 151, 127 N. W. 505. Upon that appeal this court held the action to be an equitable action to quiet title, as claimed by respondent herein, rather than an action to recover the possession of land and the value of its use, as claimed by the appellant. We must therefore consider that the question of the form and nature of the action is settled, and that adversely to the contention of the appellant.

The original action was begun on February 17, 1907. It was brought by the plaintiffs as owners under a government patent to the plaintiff Robert Blessett, and a quitclaim deed from said Blessett to R. Percy Abbey, and against the defendants E. L. Turcotte and M. Turcotte, with Robinson & Lemke intervening (on motion of the defendants) as grantees of one half of the property as security for fees earned in the suit. The answer alleges that the defendants "are the owners of said property mentioned therein, and entitled to the possession thereof by virtue of a certain real estate mortgage dated January 25, 1890, made, executed, and delivered by Robert Blessett to William F. Galloway, for the sum of $700 and interest; that ever since the spring of 1896 the said defendants E. L. Turcotte and M. Turcotte have been the owners and holders of said mortgage; that the same is, and has been since the 25th day of January, 1891, due, owing, and wholly unpaid; that in the spring of 1896, under and by virtue of their interest in said land under said mortgage, said defendants, with the consent of the plaintiffs, did enter into possession of said land, and have been in the possession of said land under said mortgage, and have held and claimed the same adversely to the plaintiffs ever since, and such adverse possession has been at all times well known to said plaintiffs; that said mortgage is a good, valid, legal, and subsisting mortgage, and was given for a good, valid, and legal consideration; that plaintiffs have been in the open, actual, adverse, and undisputed possession of said land for more than ten years prior to the commencement of this action, and that they have,

prior to the starting of this action, paid all taxes and assessments legally levied upon such land during such time; that the defendants have been mortgagees in possession of said land, claiming the same adversely to the plaintiffs for more than ten years prior to the institution of this action, and that plaintiffs' alleged cause of action therein accrued more than ten years prior to the commencement of this action, and that the same is barred by the statute of limitations in such case made and provided, which defendants herewith plead as a defense to this action." The complaint also, among other things, alleges "that the defendants assert an adverse claim based on a mortgage dated January 25, 1890," etc. It, however, also alleges that the use of the land since the occupancy under the mortgage has been reasonably worth $400 a year, in all more than enough to satisfy the mortgage debt, and that the mortgage is therefore extinguished."

The only difference between the issues presented upon this and upon the former appeal lies in the fact that in the former trial and appeal the defendants relied upon a tax deed, while in this case they rely upon their occupancy under the mortgage. It is true that plaintiffs stated in their complaint in the former case that "said adverse title is based on a mortgage made by Robert Blessett to William F. Galloway to secure $700, and on an assignment of the mortgage to the defendant, and also on a pretended tax deed dated March 11, 1897; also on a deed from Galloway to the defendants, dated May 20, 1898." Defendants, however, in their answer, and upon the trial, relied solely upon the tax deed in question, and upon such trial asked leave to strike out of their answer an allegation in regard to the mortgage, similar to that contained in the answer on this appeal, and on which, in fact, the whole defense in the present case is based. In the former appeal the issues and claims under the tax deed were decided against the defendants, and the case was sent back for retrial, but merely upon the question of the mortgage, and the proper basis of the accounting if an accounting was to be had. It is for the court, therefore, upon this appeal, to determine whether the claim of plaintiffs is barred by the ten-year statute of limitations, and, if not barred, on what basis the accounting between the parties should be had. Certain facts seem to be abundantly proved; namely, that at the time that plaintiff Blesset proved up on the land in question he gave his note to W. F. Galloway for money loaned to him to make the proof, and for

his living expenses while making proof; that this note was secured by the mortgage in controversy, and was dated January 25, 1890; that in addition to this indebtedness Blessett owed Galloway considerable sums of money which were secured by a chattel mortgage on certain crops and on stock; that in the fall or winter of 1890 Blessett sold the grain covered by Galloway's chattel mortgage, turned the stock over to neighbors, and left for Canada with the proceeds of the sale in his pocket, where he has since continued to reside; that at the time of such departure Blessett owed Galloway over $1,100 on the chattel mortgage and real estate mortgage in question; that on learning of Blessett's departure G. F. Galloway, acting under instructions from W. F. Galloway, entered into possession of the land and paid up the taxes, and rented it for the year 1891, and that he paid the taxes on it every year until he sold it; that on August 10, 1896, he sold the land to the defendant E. L. Turcotte for three notes for $300, but told him that he could not give him a deed for it until W. F. Galloway got a tax deed, and that he had a mortgage on the land; that he agreed that Turcotte was to have the mortgage; in other words, that for his three $100 notes Turcotte was to have the mortgage and the land; that afterwards and when he got the tax deed, which was on the 20th day of May, 1897, W. F. Galloway gave a deed of the land to Turcotte, and four years later, on December 30, 1901, assigned and turned over to him the said real estate mortgage; that G. F. Galloway was in possession of the land on behalf of W. F. Galloway until he sold the land to Turcotte, and during such time was trying to find a purchaser therefor; that he gave the deed and turned over the mortgage to Turcotte when he had only paid $60 on the $300 claim; that the mortgage was never recorded; that at the time the mortgage from Robert Blessett to W. F. Galloway was taken there was a house on the land, but there is no proof as to the amount cultivated; that from 1890 to 1896 the taxes were paid by W. F. Galloway; that when the sale was made to Turcotte, G. F. Galloway agreed to send to W. F. Galloway, in Canada, and secure the $700 note and mortgage, and did so, and turned them over to Turcotte some time in the month of August, 1896, but the written assignment of the mortgage was not delivered to Turcotte until December, 1901; that the deed from Galloway to Turcotte was dated May 20, 1897, and was delivered to Turcotte as soon as Galloway got the tax deed; that on leaving North Dakota,

Blessett went to Manitoba, where he has a home and farm; that he has never been back to North Dakota, and has made no attempt to recover possession of the land, has paid no taxes, and has paid no part of his indebtedness to Galloway; that in 1901 a neighbor of Turcotte's saw Blessett in Winnipeg, and had a long conversation with him, but that Blessett said nothing about North Dakota, his neighbors, or his old property; that sixteen years after Blessett had left the country and Galloway had taken possession of the land, and ten years and nine months after Turcotte had entered into possession of the land, and ten years and five months after Turcotte had secured the physical possession of the note and mortgage, but only about nine years and eleven months after the issuance of the tax deed to the said Galloway (March 11, 1897), and about nine years and ten and one-third months after the delivery of the deed from Galloway to Turcotte, Blessett, on February 13, 1907, executed a quitclaim deed to the land in controversy to the plaintiff Abbey, for the expressed consideration of $1, and that this action was commenced on February 13, 1907, or sixteen years after Galloway entered into possession, and ten years and nine months after Turcotte entered into possession of the land. There was also evidence of an oral agreement between Blessett and Galloway, made prior to the execution of the mortgage in question, to the effect that in case Blessett should decide to give up or dispose of the land in question he would turn it over to Galloway, and Galloway was then to pay Blessett the difference between the value of the land and Blessett's indebtedness to Galloway. Proof of this agreement, however, was objected to as incompetent, irrelevant, and immaterial, and as tending to prove a contract that was fraudulent and void under the laws of the United States, and the statement was afterwards somewhat modified by the witness in the following questions and answers: "Q. Isn't it a fact that he was helping Blessett to get a start in a new country for himself? A. Yes, that is what he did, and he advanced money to help him along. Q. To help him get a new home in a new land? A. Yes, sir. Q. And then in case he should decide finally to sell this land, before turning it over to anybody else he was to give the first chance to Galloway? A. Yes, sir, that was the understanding and agreement between Blessett and W. F. Galloway in Canada." The mortgage, also, which was given after the alleged conversation, contained the following provisions:

"And it is further agreed that should the party of the first part fail to pay the taxes aforesaid when due, the party of the second part, if he so elect, may pay the same, and the amount so paid shall draw interest at the rate of 10 per cent per annum, and this mortgage shall stand as security therefor. The party of the first part further agrees that if default be made in the payment of said notes, principal or coupons, or the taxes as aforesaid, then, in that case, said party of the second part, his heirs, executors, administrators, or assigns may, at his election, declare the principal note due and payable, and may proceed to collect the same with all accrued interest and taxes due up to the time of payment. And the said party of the first part further agrees that if said note, principal or coupons, or either of them, be not paid when due, whether on the full maturity thereof or on being declared due on account of default made, as aforesaid, when, and in that event, the said party of the second part, his heirs, executors, administrators, and assigns, is hereby authorized and empowered to sell the hereby granted premises, and convey the same to the purchaser, agreeable to the statute in such cases made and provided, and out of moneys arising from such sale, to retain principal and interest which shall be then due upon said note, and all taxes upon said land, together with all charges, disbursements, and the sum of $25 attorneys' fees, paying the surplus, if any, to the party of the first part, his heirs, executors, administrators, and assigns." The court below found the issues for the defendant Turcotte, and rendered a judgment quieting the title in him and taxing the costs of both the first and second trials against the interveners, Robinson & Lemke. From this judgment this appeal was taken and a trial *de novo* asked in this court.

The questions for discussions upon this appeal are: (1) Were the respondents holding adversely to the mortgagor, or were they holding the land merely as a security, and for the purpose of using the rents and profits thereof for the purpose of collecting the mortgage debt? (2) If the respondents were holding the land adversely to the mortgagor, did they have that possession long enough to bar the appellants' right of redemption? and (3), If the respondents did not acquire an adverse title to the property, and the statute of limitations has not run, what should the appellants pay for the privilege of redeeming, if anything; in other words, what should be the basis of the accounting between the parties?

We can see nothing in this case by which we can imply any consent on the part of Blessett to Galloway's entering into the possession of the land, much less to an assertion by him of an adverse right or title therein. Whatever oral agreement there may have been between the parties (and the validity of this oral agreement is seriously in question, and even if valid is qualified by the witness's statement as to the "first chance as a purchaser"), there can be no question that this agreement is superseded by the written instrument, the mortgage. The mortgage merely gives to the mortgagee the right to sell. It gives him no right to enter into possession or to assert an adverse ownership. When a mortgage gives the right to sell, the law implies a right and duty to sell at a public, and not at a private sale. Even a mortgagee in possession is not necessarily held to assert a right or title adverse to his mortgagor. A mere right to possession is not color of title, and to possess and to acknowledge a right of possession is not the allowance or assertion of an adverse claim. As Justice Engerud has well pointed out in the case of Nash v. Northwest Land Co. 15 N. D. 566, 573, 108 N. W. 792, a mortgagee in possession may or may not hold adversely. Under our lien theory of mortgages, it is the right of the mortgagor to retain possession of the mortgaged premises until a sale foreclosing his equity of redemption is made and a deed issued thereunder. He may, however, waive the right of possession, either by the terms of the mortgage or by consent, and give to the mortgagee the right to the possession before the foreclosure, for the purpose of collecting the rents and profits and applying them towards the payment of the debt. While holding thus, however, and while vested with this temporary right of possession, the mortgagee is not vested with the legal title, or even an adverse possession. He is holding as a trustee for, and not as an antagonist to, his mortgagor. After the foreclosure sale and deed to him thereunder he will hold adversely. He will also hold adversely after he has notified the mortgagor of his assertion of an adverse title, or has done some positive act which would imply a notification. 2 Jones, Mortg. 3d ed. §§ 1144–1152; McPherson v. Hayward, 81 Me. 329, 17 Atl. 164. The general rule requires actual notice. The exceptions have been only in cases where a positive intention to occupy adversely or to foreclose has been shown, as by evidence of entering under execution or under mortgage sale. There is a difference between

entering the land for the purpose of collecting rents and profits and entering land under a foreclosure sale. See Munro v. Barton, 98 Me. 250, 56 Atl. 844. McPherson v. Hayward, supra. Entering under a foreclosure sale is, under the former decisions of this court, probably adverse. Entering to collect rents and profits is not.

It is clear from the evidence in this case that, until this action was brought, defendants never asserted any adverse title to the land in controversy, or adverse right of possession, except under their void tax deed, nor did they enter the land for the purpose of foreclosing the mortgage. It is true that Turcotte purchased the mortgage, but the evidence is clear that it was the claim under the tax deed which was being bought, and not the adverse claim of a mortgagee in possession. Even if the defendants could have been held to have been holding under the mortgage, they held by license implied from the leaving of Blessett alone. A permissive holding is never adverse. Backus v. Burke, 63 Minn. 272, 65 N. W. 459–461, and cases there cited. They could not be ousted, it is true, without the satisfaction of their mortgage debt, but they were not adverse claimants. They did not enter after foreclosure proceedings, or for the purpose of foreclosing. The purchaser entering under color of foreclosure proceedings, enters adversely, and not by the consent of the mortgagor, and continues to hold adversely from the time he enters. Ibid. The defendants did not assert any adverse claim until the issuance of a tax deed, which was on March 11, 1897, and which was declared void on the previous appeal. The adverse possession, at any rate, did not begin until March 11, 1897. The presumption of the law is against, and not in favor of, an adverse possession. Dutton v. Warschauer, 21 Cal. 625, 82 Am. Dec. 765.

Defendants claim that the "right of a mortgagee to acquire title by adverse occupancy is not confined to cases of void foreclosure. It extends, as well, to situations where the mortgagee enters with the express consent of the mortgagor, and thereafter repudiates the right of the mortgagor to the mortgaged property, and gives notice of his change of attitude," and cites Nash v. Northwest Land Co. 15 N. D. 566, 108 N. W. 792, and Spect v. Spect, 88 Cal. 437, 14 L.R.A. 137, 22 Am. St. Rep. 314, 26 Pac. 203. But when was there notice given in the case at bar, and when a repudiation of the title of the mortgagor

and of any claim under the mortgage until the claim under the tax deed on March 11, 1897, even if we concede that the abandonment of the land by Blessett implied an assent to the entry under the mortgage? The case of Nash v. Northwest Land Co. is a case of entry under a void foreclosure sale, and in it the rights of an innocent purchaser are involved. It is not a case which is similar to the one at bar. Practically the only cases, indeed, where they can be said to be an adverse title asserted by the mortgagee in possession, under the new rule where the legal title is in the mortgagor, and not in the mortgagee, is such a case as Nash v. Northwest Land Co. supra, where the mortgagee forecloses his mortgage and takes possession under the sale. The case of Nash v. Northwest Land Co. does not, when closely examined, bear out the contention of the defendants in any particular. In it all that Judge Engerud says is that "a mortgagee in possession may or may not be holding adversely. The only necessary essentials to give rise to that relation are the existence of a mortgage and the consent by the mortgagor that the mortgagee take or hold possession of the property by reason of the mortgage and as security for the debt. The acknowledgment or recognition of the mortgagor's right on the part of the mortgagee when the possession is taken or while it is held is not essential. So long as the relation continues, the rights and liabilities arising out of it are the same whether the mortgagee acknowledges the relation or not. This is illustrated by the case of Finlayson v. Peterson, 11 N. D. 45, 89 N. W. 855, above cited. The defendant in that case was held to be a mortgagee in possession, although her possession was unquestionably adverse from its inception. The following cases illustrate and support the same proposition: Robinson v. Fife, 3 Ohio St. 551; Rogers v. Benton, 39 Minn. 39, 12 Am. St. Rep. 613, 38 N. W. 765; Hubbell v. Sibley, 50 N. Y. 468; Miner v. Beekman, 50 N. Y. 337; Wood, Limitations, § 225. So long as the mortgagee acknowledges or recognizes the mortgagor's right to the land, the statute of limitations does not run against the latter's remedies." So, too, the case of Finlayson v. Peterson is merely a case where a title was sought to be quieted against a purchaser under an illegal foreclosure, and the mortgage permitted the mortgagee to pay the taxes against the land and add the amount so paid to his claim, and such mortgagee obtained a tax deed on the land. It was held that as the foreclosure was illegal, the defend-

ant acquired no title to the land, either by said tax deeds or by the deed of warranty given him by the purchaser at the foreclosure sale, and that having taken possession peaceably and by the express consent of the mortgagor, and by her knowledge and acquiescence, he could not be ejected from the land in any form of action until his debts and other just claims for taxes had been paid. In the opinion the court expressly said: "It will readily be seen in this case that the question is not presented whether a mortgagee, after default or upon a sheriff's deed based upon an abortive foreclosure, may, without consent, take peaceable possession of the premises and maintain such possession as against the mortgagor or his assignees." And the case of Rogers v. Benton is a case of a mortgage foreclosure sale where, after such sale, the mortgagee went into possession of the land with the consent of the mortgagor, asserting, of course, a title not on the basis of the old mortgage or his right to collect thereunder, but on his title as a purchaser at the sale. The same is true of Backus v. Burke, supra. Judge Engerud, in short, is merely explaining his premise. "It is contended by appellants that a mortgagee in possession cannot be in law an adverse claimant. It is true that loose expressions to that effect may be found in the books, but such an unqualified statement is very far from the truth. A mortgagee in possession may or may not be holding adversely." When he says that "the only necessary essentials to give rise to that relation are the existence of a mortgage," etc., he is speaking of the relation of the mortgagee in possession, whose possession, he says, may or may not be adverse. The distinction between a mortgagee who holds possession for the purpose of collecting rents and profits, and one who holds adversely under an abortive mortgage sale, is thoroughly explained in the case of Backus v. Burke, 63 Minn. 272, 65 N. W. 459. "We are of the opinion," the Minnesota court says in that case, "that when there is a default in the mortgage, and the mortgagee in apparent good faith makes a void foreclosure, and after the end of the year to redeem, the purchaser at the foreclosure sale takes possession under color of the foreclosure proceedings, he should be treated as a mortgagee in possession, whether he takes possession with or without the consent, either express or implied, of the mortgagor. It is true that, unlike a mortgage at common law, a mortgage under our statute gives the mortgagee neither the title nor right of possession. But the courts were long ago com-

pelled to recognize a marked difference between the character of our statutory mortgage after default but before foreclosure, and the character of the same mortgage after an abortive foreclosure and the year to redeem has expired. Thus it has been held that an ordinary conveyance, made by the mortgagee of the mortgaged premises before foreclosure, does not transfer or assign his mortgage lien. Hill v. Edwards, 11 Minn. 22, Gil. 5; Everest v. Ferris, 16 Minn. 26, Gil. 14. But it is also held that such a conveyance, made by the purchaser at an abortive foreclosure sale, does convey his mortgage lien on the premises so attempted to be conveyed. Johnson v. Sandhoff, 30 Minn. 197, 14 N. W. 889; Holton v. Bowman, 32 Minn. 191, 19 N. W. 734; Jellison v. Halloran, 44 Minn. 199, 46 N. W. 332. Every mortgagor understands, when he executes a mortgage, that if he defaults in the conditions to be by him performed an attempt will be made to foreclose the mortgage. If he makes no effort to take advantage of the irregularities in an abortive foreclosure until after the year to redeem has expired, and the purchaser at the foreclosure sale has in good faith taken possession, what court will then oust such purchaser without payment of the mortgage indebtedness, even though there was no express consent of the mortgagor to such possession, and the circumstances raise no presumption of an implied consent? In the cases of Pace v. Chadderdon, 4 Minn. 499, Gil. 390; Johnson v. Sandhoff, and Holton v. Bowman, supra,—the mortgagee's right to such possession was not made to depend on any such express or implied consent of the mortgagor. Surely the mortgagor cannot, in such a case, obtain possession except through an action to redeem, whether the purchaser has been in possession one day or nine years. But if the purchaser has been in possession only one day, it cannot be held that so short a period of possession is of itself sufficient evidence of the consent of the mortgagor to that possession. Then it cannot be held that the purchaser's right to continue in such possession, taken peaceably and in good faith, after the year has expired, is based on the mortgagor's consent, express or implied, but, on the contrary, it is based on that rule of law which denies to the mortgagor in such a case any remedy but one in equity, which will compel him to do equity; and in the meantime the statute of limitations has been running against him since the purchaser took possession. But how can the statute of limitations run against the mortgagor if it is by his consent or

license that the purchaser is in possession? It is a well-settled principle of law that the statute of limitations does not run in favor of an occupant of land in possession by the license or consent of the owner. 1 Am. & Eng. Enc. Law, 251; 2 Wood, Limitations, § 256. This rule is applied to the mortgagee of a common-law mortgage who takes possession by agreement with the mortgagor. 2 Wood, Limitations, § 235 and note 2; Marks v. Pell, 1 Johns. Ch. 594, and cases cited. Of course, there are cases where the licensee in possession may, by his acts, repudiate his license, and thereafter hold adversely to the licensor. 1 Am. & Eng. Enc. Law, 251; 2 Wood, Limitations, § 256. But if such a purchaser at a foreclosure sale cannot be a mortgagee in possession unless he is in with the consent of the mortgagor, he will cease to be a mortgagee in possession, and becomes a mere trespasser, liable to an action of ejectment, as soon as he repudiates his license and commences to hold adversely. We cannot hold that such is the law. Such a purchaser, entering under color of the foreclosure proceedings, enters adversely, not by the consent of the mortgagor, and continues to hold adversely from the time he enters. Neither is he liable to an action of ejectment, but the mortgagor is put to an action in equity in which he must do equity."

In the Minnesota case just referred to, as well as in the case of Rogers v. Benton, 39 Minn. 39, 12 Am. St. Rep. 613, 38 N. W. 765, the possession was with the consent of the mortgagor, and under a void foreclosure sale, and the court held that the ten-year statute of limitations would run. It is not the case at bar. The distinction is very clear. Where a person asserts an adverse claim under a mortgage sale he has repudiated the debt and the right to collect the same. He, however, has the possession, and the debt not being paid, the mortgagor, if he seeks to recover the property, should be compelled to pay the mortgage debt, that is to say, redeem. This redemption, however, is merely an equitable duty, and his right to maintain the action begins from the time when the adverse possession is first asserted. Where the mortgagee holds with the consent of the owner, but has not asserted an adverse title, the case is one merely in which the owner has consented that he may hold the property as a pledge. The statute runs against neither party in such a case, or, rather, it does not begin to run until tender of the debt for which the pledge is given and a refusal of the pledgee to re-

store the pledge upon demand by the pledgeor. Nor does it begin to run merely because of a mere delay on the part of the pledgeor in claiming a redemption of the pledge. Whelan v. Kinsley, 26 Ohio St. 131; Van Zile, Bailm. § 280; Jones, Pledges & Collateral Securities, § 581; Galloway v. Kerr, — Tex. Civ. App. —, 63 S. W. 185.

There is confusion in the *dicta* of the authorities, it is true, but not in the judgments or decisions thereunder. The words "mortgagee in possession" have both a general and a special meaning, and the courts have often failed, in their *dicta* at least, to be careful in their use. In the statutes of North Dakota the legal title is in the mortgagor, and not in the mortgagee, and the only theory on which the mortgagee can, before foreclosure, be allowed to enter upon and to hold the mortgaged property is upon the theory and analogy of a pledge. This is the contention of the defendants' counsel in this case. In the case of a pledge, however, the law is well settled that the statute of limitations does not run against the right to redeem until a tender of the debt and a request to deliver. Laches will not defeat the pledgeor's right to redeem, unless the pledgee has been injured by such laches. Whelan v. Kinsley, supra; Groeltz v. Cole, 128 Iowa, 340, 103 N. W. 977; Potter v. Kimball, 186 Mass. 120, 71 N. E. 308. The defendant can hardly be said to have been injured in this case, as he has had the use of the land and can offset the mortgage debt and the taxes which he has paid. Neither does the statute of limitations begin to run against the right of redemption from the maturity of the debt, but only from the time demand is made on the pledgeor to redeem, or his interest in the property is repudiated by the pledgee by a claim of title in himself. 31 Cyc. p. 861 and cases cited. Mere delay, too, on the part of the pledgeor in redeeming will not raise a presumption of abandonment. Whelan v. Kinsley, supra.

It may be true, as contended by counsel for respondents, and as intimated in the case of Nash v. Northwest Land Co. 15 N. D. 575, 108 N. W. 792; Hubbell v. Sibley, 50 N. Y. 468; Houts v. Hoyne, 14 S. D. 176, 84 N. W. 773, that §§ 6774 and 6775 of the Code relate solely to actions at law, and have no application to cases of an equitable nature, and that in the cases mentioned, and under such and similar statutes, the ten-year statute of limitations was held to run, and its running to begin from the time of the entry into the possession. In all of these cases, however, the possession was that of a mortgagee in possession, as

we understand the term, and as the term was formerly used; that is to say, the possession of one who was asserting title as a purchaser, and not as a holder of a lien, or who was holding the property for the purpose of foreclosure.

If, then, the plaintiffs may maintain their action, on what basis should the accounting be made? Since there is no evidence in the record as to what the land actually produced, and it would seem that the duty was upon the defendants to produce this proof, the reasonable value of the use, or the reasonable rental value, would seem to be the proper measure. This was the measure adopted in the case of Finlayson v. Peterson, 11 N. D. 45, 89 N. W. 855, and is conceded by all the parties to this suit to be the only one available. We do not, however, believe with appellants that the rental value should be based upon rental values prevailing in localities where the highest efficiency in agriculture prevails, but on the value of the use of the land as ordinarily used by ordinarily prudent men in the locality. Nor do we believe that it should be based upon the theory that all of the land was cultivated or utilized. The rental value, we believe, should be based upon the acreage actually cultivated, as cultivated land, and upon the remainder as wild land. Appellants, we know, strenuously contend that the defendant Turcotte was a trespasser, and as such should be held liable for the fullest value of the property. We hardly can look at the matter in that way. Though the plaintiffs have the naked legal right, we do not believe that they have any equities in the case. The nominal plaintiff, Blessett, abandoned the land for a number of years, and, until very recently, has paid no taxes upon it, and if the defendant had not taken possession of the land he would, when he sought to redeem from the mortgage, have been compelled to pay the full amount of the mortgage and interest, and taxes and interest thereon, and would have had no offset on account of the crops produced, whatsoever. The equities of his grantees are even smaller. Their venture, indeed, is but a land speculation,. and that of men who have bought a title for little or nothing and the lawsuit connected therewith, and which, under the common law, would have been considered against public policy. The defendant Turcotte, however, purchased the land, and paid a valid consideration therefor. We believe that in the case of an abandonment such as this the parties in possession should be held liable merely for the reasonable rental value of

the land, which they actually occupied, used, and enjoyed, and should be made to respond for the profits made thereon, but not for what they might or should have made.

When we come to the subject of rental value, however, we experience much difficulty in arriving at an estimate. This difficulty is enhanced by the fact that the plaintiffs have hardly been fair in their various petitions and arguments. They have absolutely ignored the fact that on the former appeal this case was sent back for retrial upon the issues involved, and that it is upon the evidence introduced in the present case and on the retrial that the court must pass, and not upon any theories of its own, nor even upon the evidence of the former trial, nor upon ex parte evidence sought to be interposed for the first time in the appellate court. In the opinion filed in the former appeal (see Blessett v. Turcotte, 20 N. D. 151, 127 N. W. 505), this court, on page 160, said: "The proof upon these matters, as well as upon the question as to the length of time, if any, that defendant and his grantor were in possession as mortgagees, is entirely lacking, or altogether too meager to enable this court to intelligently dispose of the equities between the parties. Owing to the condition of the record in these respects, this court has been given much difficulty which might have been avoided. We are, of course, anxious that each party be accorded his full legal and equitable rights, and we have finally concluded that the only safe course to adopt is to order a new trial upon all issues excepting the issue involving the validity of the alleged tax deed. If, upon another trial, defendant shall fail to establish possession under the mortgage for a sufficient length of time to bar plaintiff's right of redemption, then the district court is directed to take a full account between the parties as to the sum due, if any, on the note or notes secured by the mortgage; the amount of taxes paid by the defendant and his grantor on said property; the value of the permanent improvements, if any, made to said real property by defendant or his grantor, and the reasonable value of the use of such property or the rents and profits thereof during the time the defendant has been in possession of same." Under this opinion we have no right on this appeal to go outside of the record upon this appeal, and we do not believe that counsel, except in the heat of controversy and the fervor of desire, would urge us to do so. Even, however, when quoting the testimony upon the former trial, counsel are not fair nor ac-

23 N. D.—28.

curate. He, for instance, entirely neglects to state that on such trial the witness Arthur Sumner testified that "all of the land is now under cultivation that can be profitably cropped, and the balance of it is cropped for hay, and cannot be used. . . . There are portions there that are under water practically year after year. This year they may possibly be dry. I don't know. But I do know last year you could not cut around any slough any more than one swath with the mowing machine. This year, if it is dry, the hay will be useless because it will be so full of dead grass. Q. You don't mean to say that there is any slough in the middle of that land in which there is any water standing at the present time? A. If there is not, it is the first year it has not for quite a few years. There is a slough hole of about 10 acres. I should judge about 10 acres. Practically all of it remains covered with water during the season. Q. Do you know that there is any water on that 10 acres now? A. If there is not, I say that it is the first year for the last four or five years that there has not been." Counsel for appellant also cites, in his brief, the testimony of a number of witnesses as to the value of the use of the land, but in nearly every instance entirely neglects to consider the cross-examination. He also neglects entirely to give the testimony of his own witness, Herman Shaver, who testified on the present trial that he owned from 500 to 700 acres in the vicinity of the farm; that the lands he farmed were worth to him $1 an acre; that the only real money he made was on the rise in the value of the land; that he had rented a quarter section for two years for $10, and taxes, and for two years for $20 and taxes, this being in the years 1902, 1903, and 1904; that in 1901 he used to rent land sometimes as cheap as 50 cents an acre; that in 1906 he could have rented land for less than 50 cents an acre, and could have rented a quarter for from $50 to $75, with 25 acres under cultivation, "back as far as 1896, and 50 acres, and 75 acres under cultivation."

It is well, indeed, to review the testimony in some detail. We have just given that of the witness Shaver. The witness Gores testifies that the rental value of land, on the share plan, was from $2 to $2½ an acre; that the grass land was just as valuable as cultivated land, and that $2 an acre would be the rental value of the whole farm, and that there are now from 100 to 120 acres under cultivation. The witness Geo. Klier testifies that for the last twelve years the rental value was from $2½ to

$3 an acre, but he would have rented for less if he had had land to rent; that if you could get hay it would be worth a dollar an acre; that from 1897 down he made on an average $500 a quarter, farming his land himself.   He testifies that he would not give $2 an acre, now, and that new land only is worth from $2 to $3 an acre.   John Klier also testifies to the value of $2½ an acre for cultivated land, and $2 an acre for pasture land.   He, however, states that he only makes about $500 a quarter out of his land, including hay and wild land, farming it himself.   George Calloway testifies that from 1897 to 1907 the rental value was 50 cents an acre for the cultivated land, and the pasture land was worth nothing.   S. J. Atkins testifies that in 1907 he rented land at $3 an acre with good buildings on it; that the cash value during all of the years, of cultivated land, was $1½ an acre; that uncultivated land was not worth more than 25 cents an acre; that until 1900 and 1901 $1½ would be big rent; that for the last four or five years prior to 1907, $2½ an acre would be the rent; since 1907, $2½ an acre.   He, however, testifies that he is testifying as to his own land, and not as to the value of the land under consideration, and that the land in his part of the country is much more valuable than the land in question; that for the years 1896, 1897, 1898, and 1899 the cash value of the land would be very small; that 50 cents would be a low figure for the land that was under cultivation; that as a matter of fact, land could be got very easily up there.   There was a lot of land held by the government open to entry; that the value depended largely upon the price of wheat; that during those years the price of wheat was low; that wheat commenced to go up in 1896; in the fall of 1896 it went up to a fair price, around 60 or 65 cents, and in 1897 it was up to 60 and 70 cents; that land that was not broken and put into crop would not be worth more than $25 cents an care.   George Blose testifies to the renting of one piece of land for $3 an acre for one year, and $2 an acre for four years; that from 1897 with good farms and with good farming, a man renting on shares could make from $1.25 to $2 per acre, and probably more.   J. E. Robinson, the plaintiffs' attorney, and the owner of at least a portion of the land, testifies to a rental value of about $3 an acre.   He testifies, also, that there is a depression of 5 or 6 acres which has been apparently covered with water, and that in the center of the quarter section there is a "depression covered with growing grass.   This is hay land, and it

is about 40 rods in length in the longest part and about 20 rods wide in the widest part. I went there with a view of measuring it, but it is so irregular that it would not be very easy to measure it. On the south side of the quarter section there is a tract of hay land in regular form, and it is from 20 to 25 rods from north to south, and it extends over the quarter section from two thirds to three fourths of the distance. All the rest of the land, except that which I have described is plow land, and has been plowed, and at most the land which has not been plowed is 40 acres." He testifies, however, that he had only been on the land once, and that was just prior to the trial and in the year of 1911. In regard to the hay land, on cross-examination he also testified: "Q. You do not know the condition which the land has been in before this spring? A. No, only as I can observe from its present condition. It is now in the condition that I have described. Q. If a large part of this land which you call hay land was covered with water in the past years you would not know anything about it? A. I would know that it has not been covered with water so as to interfere with the growth of the grass, except the 5 or 6 acres in the northwest corner. All the rest is under cultivation or covered with a heavy growth of grass. Q. Is there a ravine that runs across that land? A. Yes, that is what I have described. Q. That would be a slough in a wet year? A. I do not know. There is no slough there now, and it is covered with a heavy growth of grass." E. L. Turcotte testifies that the rental value of the land under cultivation was $1½ an acre; that as to the hay land down to three years ago, hay land was worth $5 a quarter; three years ago, $10 a quarter, and that for seven years he rented a half section for $10 a quarter, and that he now, at the time of the trial, gets it for $10 a quarter; that prior to eight years ago he did not pay anything, because he could go out and get hay anywhere without paying anybody for it. J. S. Lewis, on being recalled, testified that the rental value of the land from 1897 to 1902 would be 75 cents an acre for the cultivated portion, and that that would be a big price; that from the year 1902 to the time of the trial the value would be $1 an acre; that hay land from 1896 to 1902 was worth $2½ a quarter; from 1902 to 1905, $5 a quarter, and from 1905 to the time of the trial, $10 a quarter. He testified that at the time of the trial 100 acres were under plow. He also said: "The rest of it, the most of it I should judge. about 5 acres, may be,

has always been under water up to this last year, the biggest part of the time the entire season, and was so soft that they could not cut the grass in the slough. It has been of no use to the owner of the land up to this last year," that in 1896 a farm with 100 acres broken and 5 acres ready for crop, a farm house, a large building and granary, and a well, sold for $800; that breaking and stoning would cost $4 an acre in the past, and now would cost $4½. James Taylor testified that he owned 120 acres of land in the neighborhood; that in 1900 land 4 miles from the land in question rented for $1 an acre; that he did not know of any land being rented for cash prior to that time. Q. Would it have been possible, in your opinion, to have rented that land for cash? A. No, I don't think it would. I would like to add this, or I would like to make a little explanation of why I did not consider it of any value. During 1888 to 1890 there was a bunch of settlers came out to that part of the country and settling on the land, proving it up, and leaving the country, and the land went back to the mortgage companies or men who held the mortgages, and up until 1901 you could get all that land you wanted just for farming it,—go out there and get it free of charge. They would give it to you in order to keep it under cultivation." He testified that there were 100 acres under cultivation at the time of the trial, and the rest was grass. "There has been what we call Turcotte's lake there, and part of it is on that particular piece of land. Q. About how much of that land would that lake take up? A. Well, the lake proper, I don't know as it takes up such an awful lot of it, but there is a kind of draw or ravine that runs down from the west side of the place. It is not in the lake proper. Part of it is, and some of it is in a big slough. Q. It is so wet you could not cut it? A. I don't know of them cutting it. I have seen it when it was so wet you could not cut it. There may have been some years it could be cut. Q. What would be the value of the use of the land that was not cultivated upon that section? A. It has not, until this last year, been of any value—practically of no value. The reason for that is that there is a great deal of state land, state and school land, up in that locality, and you can rent it. In fact, a year ago last August I offered a quarter section for sale at public auction right in that neighborhood there, and we did not get a bid on it. Q. Have you heard of any parties being paid for hay land up there? A. No, with the exception that

they rent the school lands; I have a quarter section rented, and pay $10 for it. I think this is the fifth season. Prior to that, sometimes we would pay $2 and $3 and $5 per quarter, and in the early days we did not use to pay anything. We used to go out and cut all we wanted." He also testified that when, on the former trial he said that he had known land to rent as low as $2 an acre, and as high as $3½ an acre, he was not speaking of land in the vicinity of that under considera-tion. He also testified that the cost of breaking and stoning was $4 or $4½ an acre. George Galloway testified that in 1891 he rented the land to Miller for one half of the crop, and hunted ducks on the farm, and the witness Herman Shaver, as we before said, testified that the land he farmed brought in $1 an acre; that he made his money out of the rise in value in land; that he rented a quarter section in 1902, 1903, and 1904, for two years for $10 and taxes, and two years for $20 and taxes; that in 1901 he used to rent land as cheap as 50 cents an acre; that in 1906 he could have rented a quarter section for from $50 to $75, with 25 acres under cultivation, perhaps 50 and 75 acres, and this back as far as 1896.

From all of this evidence we cannot help feeling that there is nothing in the record that would justify us in allowing more than $8 a quarter for the wild land. There is no evidence in the record, whatever, that the wild and uncultivated land is of any value whatever; and the weight of testimony tends to show that what little hay land there was was usually under water, and, when not so, was so covered with dead grass as to be of little value. It also shows conclusively that during the greater number of the years of the possession of the defendant there has been a large amount of unoccupied wild land, and that hay could be obtained almost anywhere. As far, too, as the rental value of the land is concerned, and since we do not, upon this appeal, attempt to determine the value of the crop or of the use for the season of 1911, we believe that an average of $1½ an acre is a reasonable allowance, and practically the only allowance which is justified by the testimony, es-pecially as we are, perhaps, somewhat liberal in estimating the acreage. Even plaintiff's strongest witnesses testify that they have only made, out of their land, farmed by themselves, an average of $500 a quar-ter. A rental price of $1.50 an acre, or $240 a quarter seems to be a fair rental under these conditions. It may be that during some par-

ticular years the value was much greater, but we must remember that in this case we are seeking to determine the average value for a period of some thirteen or fourteen years, and that it is the average value, and not the value for any particular year, that we must arrive at. We, too, wish to remind counsel that we are limited by the proof in the case, and have no right to go outside of it. He, of course, except in the heat of argument and in the fervor of contest, would not seriously press his contention that the court must take judicial notice of the value and nature of crops that are raised on some particular quarter section of land, nor that when this court is reviewing a retrial, it can take into consideration statements and utterances which are entirely outside of the record of the present case.

When we come to the question of the amount of land under cultivation, we also experience much difficulty in arriving at a satisfactory conclusion, owing to the incoherence of the testimony. It is clear, however, and undisputed, that the mortgage had run and taxes had accrued and were unpaid, for a number of years before the land was either occupied or cultivated by the defendant Turcotte, and that at no time after his occupation has all of the land been placed under cultivation, and for many years but a very small portion thereof. On examining all of the evidence, we are not at all sure that in 1896, and when the defendant Turcotte first entered upon the land, there were 40 acres broken, as claimed by counsel for appellants. We are quite satisfied, however, that at the time of the trial there were some 120 acres under plow, and that even if 40 acres were not cultivated in 1896 and the amount then under cultivation was 20 acres, the additional 20 acres was soon added. We are aided in this conclusion by the fact that the amended complaint positively states "that in the summer of 1896, the land being vacant and unoccupied, the defendants did enter upon the same and plowed back 40 acres that had previously been broken and cultivated," and that no denial whatever is made of this allegation in the answer. It is true that the witness Turcotte sought to refute the same, but his testimony is absolutely incoherent. It is true, he said that he only plowed back 20 acres the first year, but he qualified this statement by saying that he plowed back all that had previously been broken. When asked as to what he broke the subsequent years, he was entirely indefinite, and only began to make positive statements

when recalled by his counsel at the end of the trial. So, too, this court, on the former appeal, found the amount to be 40 acres, and the fact may perhaps be said to have been established and to be in the record. We believe, however, that an allowance should be made to the defendants of $320 for breaking and stoning the land, and which turned the land from wild to cultivated land, and increased its rental value to the benefit of the plaintiffs. We utterly fail, however, to agree with counsel for appellant in his contention that the defendant should be mulcted in damages for a deterioration in the value of the land on account of seeding it successively to wheat, or be charged a rental value based upon the rental value of land cultivated according to the highest degree of agricultural skill. Appellant bases his contention throughout upon the supposition that defendant was a trespasser. In this, as we have before said, we believe he is entirely wrong, and that the equities, though not the mere naked law, is in favor of the defendant, and not of the plaintiffs. Much as we regret the fact, it is not yet the custom in this state to cultivate land with the same degree of skill as if it were the $200-an-acre land in central Illinois.

After allowing defendants for their mortgage and interest thereon, and their taxes and interest thereon, and the cost of breaking and stoning the land and interest thereon, and the plaintiffs the value of the use of the land upon the basis heretofore outlined, we find that there is still owing to the defendants the sum of $869.50. The judgment of this court is that the title to the land in controversy be quieted in the plaintiffs and interveners according to their respective interest, as shown by the amended complaint and the complaint in intervention herein, and as against said mortgage, said taxes, and said defendants, on the plaintiffs paying, within sixty days of the filing of the remittitur herein, to the clerk of the district court, for the use of said defendants and to be paid on demand by said clerk to said defendants, the sum of $869.50, less the sum of $175, which this court orders allowed to the appellants towards their printing expenses. No other costs or disbursements will be taxed or allowed to either party; and the district court is hereby directed to vacate its judgments hereintofore entered and to enter judgment in accordance with this opinion. The judgment entered herein, however, is not to prejudice the right of the plaintiffs to institute an action against the defendants to compel an accounting for the value of

the use of the land subsequent to the season of 1910, as, there being no proof upon this subject in the record, the matter has not been taken into consideration by us. If the said sum of $694.50 shall not be paid as herein provided, and within the time herein provided, the district court is directed, upon proof of such failure, to enter a judgment dismissing this action.

The judgment of the District Court is vacated and reversed, and judgment is ordered to be entered in such court in conformity with this opinion.

BURKE, J. (dissenting in part). There are several propositions in the foregoing opinion to which I cannot assent.

Plaintiff brings this action to quiet title to a quarter section of land. Defendants first claimed hostile title under a tax deed. This court held the tax deed void. Defendant next claimed title as a mortgagee in possession with the consent of the mortgagor, for a period of ten years, during which time he claims to have been in open, notorious, adverse possession, and has paid all taxes. This court has now decided this claim against him. Therefore plaintiff is entitled to a decree quieting title in himself, subject only to the rights of defendant under his mortgage. This court now makes an accounting between the parties in which the defendant is allowed taxes and interest thereon, and for breaking the land and interest thereon, and for stoning the land and interest thereon, although defendant has not asked for those items in his answer, and incurred such expense in attempting to take the land away from plaintiff, and not for his benefit. On the other hand, when it comes to allowing the plaintiff for the use of his land, the most rigid economy is observed. Pasture land is only worth 5 cents an acre. This for some 2,000 year acres, and no interest thereon either. But while this manner of accounting is not equitable by any means, yet it is not so objectionable as the next order of this court. The opinion says that this mortgage, and the breaking and stoning expenses, and the interest thereon, must be paid within ninety days, or the action will be dismissed. When we remember that defendant has not asked for his money at all, this seems to me to be unjust. In my opinion plaintiff is entitled to have his title quieted, subject to the mortgage, and not be forced to pay up so suddenly. Again, § 7178, Revised

Codes of 1905, says: "Costs shall be allowed, of course, to the plaintiff in the following cases: (1) In an action to recover real property."

Sec. 7180 reads: "In the following cases the costs of an appeal must be in the discretion of the court: (1) When a new trial shall be ordered; (2) when a judgment shall be affirmed in part and reversed in part." Under these sections, I believe the plaintiff entitled to his costs in this action; he is the plaintiff and has recovered real property, and he has secured a straight reversal of the judgment of the trial court.